ROBERT B. WOODWORTH, for the use of WARREN STONE and ALEXANDER GRANT, v. LEVIN J. WILSON.

Plaintiff was liable on certain notes on which M. was primarily bound. M. died; and plaintiff having applied for the curatorship of M's estate, was induced to withdraw his application at the instance of defendant—who having an interest in the estate of deceased—agreed to deliver a certain quantity of lumber to plaintiff, at certain designated times, equal to the amount of the notes. *Held:* there is nothing immoral in such a contract; and defendant having failed to deliver all the lumber within the stipulated period, his liability to plaintiff is absolute for the amount of the notes, less the value of the quantity of lumber actually delivered.

*Quære.* Whether it is not against the policy of the law to enforce any contract which directly or indirectly has for its consideration the withdrawal of the applicant for the office of Executor, Curator, or Administrator of a succession, in order to secure the appointment to another?—MERRICK, C. J.

APPEAL from the First District Court of New Orleans, *Buchanan*, J. *Bartlette* and *Clack*, for plaintiff and appellant. *Roselius*, for defendant.

LEA, J. *Robert B. Woodworth* being the endorser of a note drawn by *S. C. Mauson*, and the drawer of another made for *Mauson*'s accommodation, made application, upon the death of *Mauson*, for the curatorship of his estate. This application was opposed by the defendant, *Levin J. Wilson*, who was the son-in-law of the deceased. For the purpose of inducing *Woodworth* to withdraw his claims to the curatorship, *Wilson* signed the following obligation:

                    "New Orleans, December 28th, 1841.

"I agree to deliver *to R. B. Woodworth* lumber to the amount of two notes held by *Messrs. Cucullu, Lapeyre & Co.* and *Alexander Grant*, amounting to $2,377 08, in consideration the said *Woodworth* agree to give me the said notes and withdraw all claims as Syndic or Curator of the estate of the late *S. C. Mauson*, the price of lumber to be as follows: prices flooring dressed, $28; weather boarding, $12 50; inch 1¼ flooring, $14; scantling and inch boards, $12 50. The above prices *Mr. R. B. Woodworth* agrees to guarantee and use all diligence to realize a higher price, which if done, he, said *Woodworth*, is to give me strict account of the same. I further agree to deliver to said *Woodworth* the lumber at following time, say, one, two, three and six months, and sooner if convenient, and at New Basin, New Orleans.

                                   *L. J. Wilson.*"

This document is the basis of the litigation between the parties, and upon its proper construction depend their respective rights. The document is evidently drawn up by a person not accustomed to composition, and is expressed in obscure and incorrect language. The circumstances, however, under which it

was executed are so clearly established by the evidence, that we think there is no difficulty in arriving at a correct interpretation of the true intent and meaning of the parties. We think the identity of the notes annexed to the petition with those referred to in the document sued upon, is sufficiently established; and the fact that the stipulations therein contained were acted upon by both parties, we consider sufficient proof of an acceptance by *Woodworth.*

What then was the nature of the obligations which the parties' respectively contracted? It has been argued as if it were a contract for the purchase of lumber, deliverable at fixed periods and at certain prices; but we think a perusal of the document itself (to say nothing of the explanatory evidence) will show that it is wanting in the essential ingredients of a contract of sale. It is true *Wilson* agrees to *deliver* lumber to *Woodworth*; but for whose account? clearly for his own. *Woodworth* agrees to sell the lumber; it is true he GUARANTEES to *Wilson* a minimum price, but in the same sentence he agrees " to use all diligence to *realize* a *higher* price," and if successful, " to *give a strict account of the same*" to *Wilson.* This language absolutely repels the idea of a sale. A vendee cannot be accountable to his vendor for the re-sale of the property purchased; far less is he bound to credit his vendor with the proceeds of the re-sale.

It is evident that *Woodworth's* position was that of an agent with an interest in the agency. As we understand the relations of the parties, they are substantially as follows: *Woodworth* was likely to be a successful applicant for the curatorship of *Mauson's* estate; he had an interest in this curatorship, which was, to secure the payment of the two notes upon which he had become liable for *Mauson's* accomodation. *Wilson* had also an interest in the administration, as representing, on behalf of his wife or her children, a residuary interest as heirs at law. Now, it was certainly competent, under the circumstances, for *Wilson* to say to *Woodworth*, as in substance he did say, if you will withdraw your claim to the curatorship, and allow me to administer upon this succession, I will see that these notes upon which you are liable shall be paid; and for the purpose of securing the payment, I promise to deliver to you at stated periods within the next six months " *and sooner if convenient*," a sufficient amount of lumber to enable you by a sale of the same to realize funds to extinguish the notes. You are to deliver to me the notes when paid; you are also " to use all diligence to realize" a high price for the lumber for which you are to render me " *a strict account*," and in no event is the price of the lumber to fall below a fixed sum for which you agree to be accountable. Under this contract, *Wilson* actually did deliver lumber to the amount of $300 in value, but has altogether failed and refused, though thereunto requested, to deliver any more; and he now urges as matter of defence that the contract was immoral, that it involved the sale of a curatorship and ought not to be enforced. We think that under the contract entered into between the parties, *Wilson* undertook to pay the two notes upon which *Woodworth* was liable; and for the purpose of effecting this payment, he also undertook within six months after the date of the contract to deliver to *Woodworth* a sufficient amount of lumber to enable the latter by sales to realize funds to be applied to the payment of the notes. *Woodworth* stands, as respects his liability, very much in the same position as a planter who has promised to make shipments of cotton to meet a city acceptance made for his accomodation. Having failed to deliver the lumber within the stipulated period, his liability on the notes has become absolute, and the plaintiffs are entitled to a judgment for the amount of the notes after deducting a credit of $300 for the proceeds of lumber delivered to *Woodworth.*

WOODWORTH
*v.*
WILSON.

We can perceive no legal objection to the substitution of *Stone* and *Grant* as plaintiffs in the case, they being the equitable assignees under a valid contract of *Woodworth's* interest in the subject matter of this litigation,—the defendant not having been deprived of any equitable defence as against *Woodworth.*

It is ordered that the judgment appealed from be reversed, and that *Warren Stone* and *Alexander Grant,* plaintiffs substituted herein, do have and recover of the defendant, *Levin J. Wilson,* the sum of $2,074 08 with interest thereon at the rate of 5 per cent per annum from the 26th day of February, 1845, till paid, with costs of suit in the District Court; and that the costs of this appeal be paid by the defendant and appellee.

MERRICK, C. J. I concur in the construction placed upon the contract by the majority of the court; but I doubt whether it is not against the policy of the law to enforce any contract which directly or indirectly has for its consideration the withdrawal of the applicant for the office of Executor, Administrator or Curator of a succession, in order to secure the appointment of another. See *Gray* v. *Hook,* 4 Comstock, 455. *Marshall* v. *Baltimore and Ohio Railroad Co.,* 16 Howard, 334.